1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

IN RE: SECTION 16(B) LITIGATION

MASTER CASE NO. C07-1549JLR

ORDER DISMISSING CASES

## I.  INTRODUCTION

Before the court are 54 derivative shareholder actions brought by one shareholder, Plaintiff Vanessa Simmonds.  The cases are based on the theory that Defendants engaged in insider trading during the late-1990s and early 2000 during which there was an increase in private companies going public.  Ms. Simmonds sued the underwriters that were responsible for underwriting the Initial Public Offerings ("IPOs") for many of these companies (hereinafter the "Underwriter Defendants"), whose duties included setting an IPO price for the shares.[1]  Ms. Simmonds also names, as nominal defendants, the

---

[1]  An IPO is a financing tool companies use to raise capital through equity rather than debt.  An issuing company, also referred to as "the issuer," can earn equity capital by selling its shares to a large number of public investors.  This process of raising capital is commonly referred to "going public" or an "initial public offering."

ORDER                                    1

companies themselves (hereinafter the "Issuer Defendants"). She asserts a claim for violation of Section 16(b) of the Securities and Exchange Act of 1934 (the "Act") against each of the Underwriter Defendants. She contends that during the underwriting process the Underwriter Defendants made agreements with other insiders and certain investors in order to profit from under priced IPOs.

Before the court is a motion to dismiss pursuant to Rule 12(b)(1) filed by 30 of the 54 Issuer Defendants in C07-1549 (Dkt. # 56); an omnibus motion to dismiss filed by all of the Underwriter Defendants in C07-1549 (Dkt. # 57); and supplemental individual motions to dismiss filed by Issuer Defendant Intersil Corporation in C07-1572 (Dkt. # 47), Issuer Defendant Audible Inc. in C07-1623 (Dkt. # 33), and Issuer Defendant Packeteer Inc. in C07-1654 (Dkt. # 39).[2] The Issuer Defendants' motion to dismiss (Dkt. # 56) presents the threshold question whether Plaintiff Vanessa Simmonds has standing to bring these derivative claims because she failed to make an adequate demand on the Issuer Defendants before instituting these actions.[3] In the Underwriter Defendants' omnibus motion, as well as part of the Issuer Defendants' motion, the Defendants ask the court to determine whether the statute of limitations for bringing these Section 16(b) claims has expired. The remaining supplemental motions seek dismissal of Ms. Simmonds' complaints against certain Issuer Defendants bringing motions for lack of standing based on separate sets of facts. For the reasons stated below, the court GRANTS in part and DENIES in part the motions as follows:

---

[2] Unless noted otherwise, all docket references are to the master docket found at *Simmonds v. Credit Suisse Sec., et al.*, C07-1549.

[3] It is unclear why only 30 of the 54 Issuer Defendants joined in the motion to dismiss. This may be the result of the remaining 24 Issuer Defendants believing that Ms. Simmonds has standing based on the information she provided to those Issuer Defendants. The court questioned Issuer Defendants' liaison counsel at oral argument on this issue but liaison counsel did not know why only 30 of the Issuer Defendants joined in the motion.

ORDER                                    2

- The court GRANTS the motion to dismiss filed by 30 of the Issuer Defendants in C07-1549 (Dkt. # 56). The court dismisses the complaints in the following cause numbers without prejudice: C07-1549; C07-1567, C07-1570, C07-1571, C07-1572, C07-1573, C07-1576, C07-1584, C07-1587, C07-1588,C07-1589, C07-1590, C07-1594, C07-1595, C07-1597, C07-1598, C07-1605, C07-1623, C07-1624, C07-1629, C07-1631, C07-1633, C07-1637, C07-1652, C07-1653, C07-1654, C07-1655, C07-1666, C07-1667, C07-1669;

- The court GRANTS the omnibus motion to dismiss filed by the Underwriter Defendants in C07-1549 (Dkt. # 57) as to the remaining 24 cases: C07-1566, C07-1568, C07-1569, C07-1575, C07-1577, C07-1578, C07-1579,C07-1580, C07-1581, C07-1582,C07-1583, C07-1585, C07-1593, C07-1626, C07-1627, C07-1628, C07-1630, C07-1632, C07-1634, C07-1635, C07-1636, C07-1638, C07-1668, C07-1670. The court dismisses these complaints with prejudice;

- The court DENIES the omnibus motion to dismiss filed by the Underwriter Defendants in C07-1549 (Dkt. # 57) as to the Issuer Defendants seeking dismissal for lack of subject-matter jurisdiction in Dkt. No. 56 from above. These motions are MOOT in light of the court's ruling on the Issuer Defendants' motion to Dismiss (Dkt. # 56);

- The court DENIES the supplemental individual motion to dismiss filed by Issuer Defendant Intersil Corporation in C07-1572 (Dkt. # 47) as MOOT;

- The court DENIES the supplemental individual motion to dismiss filed by Issuer Defendant Audible Inc. in C07-1623 (Dkt. # 33) as MOOT; and

- The court DENIES the supplemental individual motion to dismiss filed by Issuer Defendant Packeteer Inc. in C07-1654 (Dkt. # 39) as MOOT.

## II. BACKGROUND

This case involves Section 16(b) of the Act which prohibits short-swing stock transactions by insiders. It also involves IPOs that took place approximately 10 years ago. Section 16(b) establishes strict liability for insiders (i.e., officers, directors, or beneficial owners of more than ten percent of a companies stock) who purchase and sell securities within a six-month period. An insider found liable under Section 16(b) must disgorge any profits made from any of these sales and purchases – referred to as "short swing profits." Section 16(b) also contains a demand requirement. The demand

ORDER                                          3

requirement sets forth the basis by which a shareholder may obtain standing to sue on behalf of the corporation.  The shareholder is required to first demand that the corporation bring the lawsuit; if the corporation declines to bring suit, the shareholder may initiate a derivative suit on behalf of the corporation.

Between October 2 and October 12, 2007, Ms. Simmonds filed 55 separate complaints against the Defendants alleging violations of Section 16(b).[4]  The cases were consolidated for pretrial purposes before this court (Dkt. # 2).  Ms. Simmonds, a college student, brought the related derivative complaints in her capacity as a shareholder of the Issuer Defendants, all are companies that conducted initial public offerings ("IPOs") between late 1999 and early 2000.  (*See, e.g.,* Onvia Compl. (Dkt. # 11) ¶ 9.)  The complaints allege that certain investment banks, the Underwriter Defendants, violated Section 16(b)'s prohibition on short-swing transactions because they allegedly profited from aftermarket transactions executed by investors to whom they allocated IPO shares. (*See, e.g., id.* at ¶ 23.)  Each complaint is based on similar factual allegations and asserts only one cause of action for violation of Section 16(b).

The alleged factual basis for each of Ms. Simmonds' complaints is that the Underwriter Defendants colluded with insiders of the Issuer Defendants and certain investors in order to personally profit from underpriced IPOs.  (Resp. (Dkt. # 58) at 2 ("The Underwriters' insider status is based upon a recurring pattern of coordinating with key insiders."))  These same allegations appeared in an earlier consolidated case involving these Underwriter Defendants and almost all of the Issuer Defendants, *see In re Initial Pub. Offering Sec. Litig.,* 241 F. Supp. 2d 281, 293-94 (S.D.N.Y. 2003) ("*In re IPO*") (alleging fraud pursuant to Rule 10b-5 of the Securities Exchange Act of 1934),

---

[4]  One of the 55 cases originally filed, *Simmonds v. Covad*, CV07-1625, was voluntarily dismissed on April 25, 2008 (Dkt. # 18).

and in a number of other lawsuits around the country based on other theories of liability arising out of the same or similar allegations.  In the *In re IPO* master complaint, the investor plaintiffs allege that the Underwriter Defendants, investment banks entrusted with valuing and underwriting IPOs, orchestrated a vast scheme to defraud the investing public during the late 1990s IPO boom.  *Id.*  The alleged scheme took place between January 1998 and December 2000 and involved the IPOs of approximately 300 high technology and Internet-related companies.  *Id.*  The *In re IPO* plaintiffs filed over 1,000 complaints against the Underwriter Defendants and other insiders in 2001, which were later consolidated in *In re IPO*.  *Id.*

The *In re IPO* plaintiffs alleged a fraudulent scheme both far reaching and complex in scope.  Even the alleged damage resulting from the scheme is difficult to quantify and involves unwritten understandings relating to profit-sharing between the investment banks and their customers.  The crux of the plaintiffs' theory in that case is that the investment banks responsible for underwriting the 1998-2000 IPOs at issue required their investing customers to agree to purchase additional shares of a company's stock in the aftermarket in order to receive shares in the company's IPO.  *Id.* at 294.  The opportunity to purchase IPO stock was important to the banks' customers because, as alleged by plaintiffs, the average first day gain on an IPO stock was just over 60% for all IPOs during the 1998-2000 period and almost 140% for the specific IPOs at issue in *In re IPO*.  *Id.* at 294 n.2.  The *In re IPO* plaintiffs also allege that some of the investment banks required that their customers pay them a portion of the profits they made by selling the IPO shares in the aftermarket.[5]  *Id.*  All of the allegations regarding profit-sharing and

---

[5]  Judge Scheindlin's February 19, 2003 order on defendants' motion to dismiss in *In re IPO*, 241 F. Supp. 2d 281 (S.D.N.Y. 2003), provides a detailed explanation of the alleged market manipulation and fraudulent scheme surrounding the 1998-2000 IPO market, as well as a historical perceptive on the financial climate leading up to this period.

market manipulation by the investment banks were made public and likely known to most of the shareholders of these companies as early as 2001.

In the instant case, Ms. Simmonds filed her complaints for short-swing transactions based on the same set of facts as presented in *In re IPO*, albeit under a new theory of liability and almost six years later.  Specifically, Ms. Simmonds claims that the Underwriter Defendants are liable for short-swing profits allegedly made in violation of Section 16(b) because the Underwriter Defendants were statutory insiders of the issuing companies and profited from their customers' short-swing transactions that involved stock of the issuing companies.  (*See, e.g.,* Onvia Compl. ¶¶ 19-20.)

First, Ms. Simmonds contends that the Underwriter Defendants were statutory insiders because they beneficially owned more than 10 percent of the issuing companies' stock.  (*See, e.g., id.* at ¶ 19.)  Even if they owned less than 10 percent of the stock directly, she claims that they also shared beneficial interest in stock owned by directors, officers, and other significant shareholders (i.e., insiders) of the issuing companies because they entered into lock-up agreements[6] and agreed to price IPO shares at a small fraction of what they knew to be the likely aftermarket price.  (*See, e.g., id.* at ¶¶ 16-17.)

Second, Ms. Simmonds alleges that the purchases and sales involving issuer stock occurred within a period of less than six months by referring to the sales as occurring in the "immediate aftermarket" of the IPO.  (*See, e.g., id.* at ¶ 20.)  She also notes the large discrepancy between the amount investors paid for the IPO stock and the amount at which the investors sold the stock in the immediate aftermarket.  (*See, e.g., id.* at ¶ 18 ("The 9.2 million shares of [issuer] stock sold in connection with its IPO raised $197.7 million for

---

[6] "These lock-up agreements provided that, subject to limited exceptions, the stockholder could not offer, sell, contract to sell, pledge or otherwise dispose of any Onvia common stock or securities for a period of 180 days after the effective date of the IPO."  (Onvia Compl. ¶ 16.)

ORDER                                          6

[the issuer] - less than one-third of what buyers paid for [the issuer] shares in the immediate aftermarket.")).

Third, Ms. Simmonds claims that the Underwriter Defendants had a pecuniary interest in these transactions because they "shar[ed] in the profits of the customers to whom they made IPO allocations of [issuer] stock." (*See, e.g., id.* at ¶ 20.) She also asserts that the Underwriter Defendants allegedly had a pecuniary interest in these short-swing profits because they allocated "shares of [issuer] stock to executives and other high-level insiders of other companies, both private and public, from which [they] expected to receive new or additional investment banking business in return" and created "the opportunity for other [issuer insiders] to derive personal financial benefits from the sale of [issuer] stock into an inflated market, in an effort by [them] to obtain future investment banking business from [the issuer]." (*See, e.g., id.*)

The Defendants move to dismiss Ms. Simmonds' claims on various different theories. Some of the Issuer Defendants joined in a motion seeking to dismiss the complaints against them arguing that (1) Ms. Simmonds lacks standing to pursue these claims because her demand letters were boilerplate and lacked the requisite specificity and (2) Ms. Simmonds' claims are time-barred by the two-year statute of limitation for Section 16(b) claims. The Underwriter Defendants move separately to dismiss the 54 complaints on the following bases: (1) the Underwriter Defendants do not meet the two-prong test for pleading "beneficial ownership"; (2) the allegations that the Underwriter Defendants had a pecuniary interest in the issuer stock are insufficient; (3) Ms. Simmonds fails to plead a specific purchase or sale within a six-month period; (4) Ms. Simmonds' claims are time-barred by the two-year statute of limitation for Section 16(b) claims; (5) the Underwriter Defendants are shielded from Section 16(b) liability by the underwriter's

exemption;[7] (6) the Underwriter Defendants are shielded from Section 16(b) liability by the market-making exemption;[8] and (7) Ms. Simmonds fails to plead lack of good faith with particularity.  Intersil Corporation ("Intersil") moves to dismiss the complaint against it on the basis that Ms. Simmonds failed to ensure that it received her demand letter.  Issuer Defendants Audible Inc. ("Audible") and Packeteer Inc. ("Packeteer") move to dismiss the complaints against them on the basis that both companies were subject to a cash-out merger or acquisition shortly after Ms. Simmonds filed her complaints against them.

## III.  ANALYSIS

**A.    Statutory Framework**

   **1.    Strict Liability for Short-Swing Profits Under Section 16(b)**

   Section 16(b) provides that a corporation may recover profits realized by corporate insiders from the purchase and sale of securities that occur inside a six-month period (so-called "short-swing trades").  15 U.S.C. § 78p(b).  Section 16(b) provides, in relevant part:

---

   [7] The underwriter's exemption generally provides that "[a]ny purchase and sale, or sale and purchase, of a security that is made in connection with the distribution of a substantial block of securities" is exempt from Section 16 requirements.  17 C.F.R. 240.16a-7.

   [8] Section 16(d) provides an exemption for short-swing profits made in the ordinary course of business and incident to market-making activities.  15 U.S.C. § 78p(d).  In order to maintain a market for securities not traded on a central exchange, "designated broker-dealers operate as 'market makers' in the over-the-counter markets, buying and selling as principals for their own account rather than as agents for their customers."  1 THOMAS LEE HAZEN, THE LAW OF SECURITIES REGULATION § 14.10[2] (4th ed. 2004).  Acting as a principal, the market-maker sells stock to investors and buys stock from investors, often adding a "mark-up" to the price as its compensation.  *See Shivangi v. Dean Witter Reyonlds, Inc.,* 825 F.2d 885, 887 (5th Cir. 1987).

ORDER                                    8

> For the purpose of preventing the unfair use of information which may have been obtained by such beneficial owner, director, or officer by reason of his relationship to the issuer, any profit realized by him from any purchase and sale, or any sale and purchase, of any equity security of such issuer . . . shall inure to and be recoverable by the issuer, irrespective of any intention on the part of such beneficial owner, director, or officer in entering into such transaction of holding the security . . . . Suit to recover such profit may be instituted . . . by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days after request or shall fail diligently to prosecute the same thereafter; but no such suit shall be brought more than two years after the date such profit was realized.

15 U.S.C. § 78p(b).

Should the issuing corporation fail or refuse to bring such suit, a security holder may bring a derivative action on the corporation's behalf. *Id.* The purpose of Section 16(b) is to discourage corporate insiders from taking advantage of their access to non-public information by imposing a flat rule that prohibits an entire category of six-month purchase and sale transactions. *Foremost-McKesson, Inc. v. Provident Sec. Co.*, 423 U.S. 232, 234 (1976). The statute imposes strict liability on insiders who engage in short-swing trades without regard to the insider's intent. *Reliance Elec. Co. v. Emerson Elec. Co.*, 404 U.S. 418, 430-31 (1972); *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121-22 (2d Cir. 2001).

Corporate insiders subject to Section 16(b)'s prohibition of short-swing trading include officers, directors, and "beneficial owners," the latter of which is defined as a "person" holding ten percent of the issuing corporation's securities. 15 U.S.C. § 78p(a). If two or more persons form a "group," each group member may be liable under Section 16(b) if the group's holdings exceed ten percent in the aggregate. 17 C.F.R. § 240.16a-1(a)(1)(2); *see also Rosen v. Brookhaven Capital Mgmt Co., Ltd.*, 113 F. Supp. 2d 615, 618-20 (S.D.N.Y. 2000) (discussing Section 16(b) group liability as borrowed

ORDER                                    9

from the group definition for disclosure requirements under Section 13(d), 15 U.S.C. § 78m(d)(3)).

In passing Section 16, "Congress recognized that insiders may have access to information about their corporations not available to the rest of the investing public.  By trading on this information, these persons could reap profits at the expense of less well informed investors."  *Foremost,* 423 U.S. at 243.  The ultimate purpose of Section 16 is to prevent the unfair use of information obtained by an insider through his or her relationship to the issuer.  15 U.S.C. § 78p(b).  Courts refer to Section 16's provisions as "prophylactic measures" that protect against insider abuse by prohibiting all transactions in which the possibility of abuse is believed to be intolerably great, even if there is no proof of actual abuse.  *See Reliance,* 404 U.S. at 422.  Although Congress addressed some aspects of insider abuse through other remedies, the scope of Section 16 is not affected by the existence of alternative sanctions.  *Foremost,* 423 U.S. at 255.

Under Section 16(b), a corporation, or a security holder via a derivative action, may recover profits realized by an insider subject to Section 16(a).  15 U.S.C. § 78p(b).  The action must be brought within two years of the transaction.  *Id.*  If the insider fails to disclose a covered transaction in the required Section 16(a) reports, the two-year limitation period may be tolled with respect to the non-disclosed transaction.  *Whittaker v. Whittaker Corp.,* 639 F.2d 516, 530 (9th Cir. 1981).

In sum, Section 16(b) liability attaches if a plaintiff proves: (1) a purchase, and (2) a sale of securities, (3) by an officer, director, or beneficial owner of more than ten percent of the issuer's securities, (4) within a six-month period.  *Gwodzdzinsky v. Zell/Chilmark Fund, L.P.*, 156 F.3d 305, 308 (2d Cir. 1998).

ORDER                                                    10

1

**2.      Reporting Requirements of Section 16(a)**

2

At the time of the disputed transactions in this case, Section 16(a) required insiders

3

to disclose their initial ownership interests and subsequent changes thereto, within ten

4

days of a transaction. 15 U.S.C. §§ 78p(a)(B)-(C)(2001).[9]  Initial statements of ownership

5

interest are reported on Form 3 while changes in ownership interest are reported on Form

6

4.[10]  17 C.F.R. § 240.16a-3(a).  Section 16(a)'s publicity requirement is designed to afford

7

indirect protection against potential misuses of inside information.  *Foremost,* 423 U.S. at

8

255-56.  Congress recognized that stockholder trading is also subject to abuse when the

9

size of the stockholder's ownership affords the potential to access corporate information.

10

*Id.*  Accordingly, an insider subject to Section 16(a) reporting requirements includes a

11

beneficial owner of more than 10 percent of a class of registered equity securities as well

12

as directors and officers.  15 U.S.C. § 78p(a)(1).

13

**B.      Issuer Defendants' Motion to Dismiss**

14

The Issuer Defendants move to dismiss 30 of Ms. Simmonds' complaints pursuant

15

to Federal Rule of Civil Procedure 12(b)(1).  Rule 12(b)(1) permits the court to dismiss a

16

claim for lack of subject matter jurisdiction based on standing.  *Warren v. Fox Family*

17

*Worldwide, Inc.*, 328 F.3d 1136, 1140 (9th Cir. 2003).  A jurisdictional challenge under

18

this provision may be made on the face of the pleadings or by presenting extrinsic

19

evidence.  *Id.* at 1139.  When resolving jurisdiction depends on the merits of a case, a

20

21

22

23

---

[9]  In 2002, Congress passed the Sarbanes-Oxley Act, which, in part, amended Section 16(a) to now require insiders to electronically disclose changes in their equity interest "before the end of the second day on which the subject transaction has been executed."  15 U.S.C. § 79p(a)(2)(C).

24

25

26

[10]  Under Form 4, a beneficial owner subject to Section 16(a) reporting requirements must report *each transaction* in which the owner has a pecuniary interest including the owner's proportionate interest in transactions conducted by another entity.  Each transaction must be reported on a separate line.  Ownership Reports and Trading By Officers, Directors and Principal Security Holders, SEC Release No. 25254, 48 S.E.C. Docket 216 (February 21, 1991).

27

28

court may not resolve genuinely disputed facts.  *Id.*  Instead, the court must "assume[ ] the truth of the allegations in a complaint . . . unless controverted by undisputed facts in the record."  *Id.* (quoting *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987)).  At this stage of pleading, the non-moving party needs only to show that the facts alleged, if proved, would confer standing.  *Id.* at 1140 (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 104 (1998)).  Dismissal is only appropriate if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  *Id.* (citing *Conley v. Gibson*, 355 U.S. 41, 44-46 (1957)).

In their joint motion to dismiss, 30 of the Issuer Defendants claim that the demand letters, and the follow-up letters, sent by Ms. Simmonds were inadequate.  The Issuer Defendants argue that Ms. Simmonds lacks standing to bring a Section 16(b) action because she failed to sufficiently demand that they bring suit against the Underwriter Defendants before she filed this derivative action.  The parties agree that Ms. Simmonds sent letters to the issuing companies' boards of directors demanding that they bring suit under Section 16(b) against the Underwriter Defendants.  The moving Issuer Defendants, however, claim that the demands were insufficient because they failed to (1) properly identify company insiders, (2) describe the factual basis of the wrongful acts, and (3) describe the alleged short-swing profits.

Ms. Simmonds argues that the demands were sufficient because she was not required to provide the companies with specific allegations when she was not privy to all the necessary information.  Ms. Simmonds further contends that the Issuer Defendants

ORDER                                    12

had notice of her theory of the case because she sent follow-up letters that referred to "laddering" and "spinning."[11]

The question of the adequacy of Ms. Simmonds' pre-lawsuit demand is one of standing. Without standing, the court lacks subject-matter jurisdiction over these cases and must dismiss them without reaching the merits. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). *But see Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1042 (9th Cir. 1999) (finding that the district court's assumption of Article III standing did not violate the rule that a federal court may not hypothesize subject-matter jurisdiction for the purpose of deciding the merits). In this instance because only 30 of the 54 Issuer Defendants attacked Ms. Simmonds' standing and provided sufficient information for the court to evaluate the challenge, the court only considers the standing issue with respect to the moving Issuer Defendants.

### 1.    Adequacy of Demand Letters

The Issuer Defendants claim that Ms. Simmonds failed to meet the demand requirement pursuant to Section 16(b). Although no Ninth Circuit case law directly addresses this point, other federal courts have held that only the issuing corporation has standing to object to any deficiency in, or even the total absence of, a shareholder's demand. *See Dreiling v. Am. Express Travel Related Serv. Co. Inc.*, 351 F. Supp. 2d 1077, 1084 (W.D. Wash. 2004) *rev'd on other grounds*, 458 F.3d 942 (9th Cir. 2006); *see*

---

[11] Laddering is a term used to describe the situation wherein an underwriter induces "investors to give orders to purchase shares in the aftermarket at pre-arranged, *escalating prices* in exchange for receiving IPO allocations." Commission Guidance Regarding Prohibited Conduct in Connection with IPO Allocations, Exchange Act Release No. 34-51500, 70 Fed. Reg. at 19672-01 (April 13, 2005) *Id.*, at 142-43 (internal quotations omitted) (emphasis in original). Spinning refers to the underwriters' distribution of IPO shares to high-level insiders of other companies expecting to obtain future underwriting business in return. *See* Hazen, supra, § 6.3[2].

ORDER                    13

*also Colan v. Monumental Corp.*, 524 F. Supp. 1023, 1028 (N.D. Ill. 1981); *Prager v. Sylvestri*, 449 F. Supp. 425, 429 (S.D.N.Y. 1978).

While Section 16(b) creates the requirement for a demand, Federal Rule of Civil Procedure 23.1 is the procedural manifestation of the state law of corporate governance regarding the right of a shareholder to bring a derivative suit on behalf of a corporation. *Dreiling*, 351 F. Supp. 2d at 1085; *Levner v. Al Saud*, 903 F. Supp. 452, 456 (S.D.N.Y. 1994). Rule 23.1 states that the complaint must "allege with particularity the efforts, if any, made by the plaintiff to obtain the action the plaintiff desires from the directors or comparable authority." Fed. R. Civ. P. 23.1. In each of her complaints, Ms. Simmonds describes the demand letters she sent to each of the issuing companies. The substantive question of whether the demand letters are sufficient is governed by the law of the state of incorporation. *Dreiling*, 351 F. Supp. 2d at 1085; *Levner*, 903 F. Supp. at 456. All of the moving Issuer Defendants are incorporated in Delaware.[12]

Under Delaware law, a demand made upon the board of directors must at least "identify the alleged wrongdoer, describe the factual basis of the wrongful acts, the harm caused to the corporation, and request remedial relief." *Dreiling*, 351 F. Supp. 2d at 1085 (quoting *Levner*, 903 F. Supp. at 456). The shareholder generally does not need to specify the legal theory, or every fact in support of that theory, but does need to specify the facts demonstrating the wrongful act. *Levner*, 903 F.Supp. at 456. The court in *Dreiling* found that the demand was substantively sufficient because it provided notice to the issuing company of who the alleged wrongdoers were, what the alleged wrong was, and the requested relief. 351 F. Supp. 2d at 1085. In the demand letter, the plaintiff

---

[12] All of the remaining Issuer Defendants are also incorporated in Delaware except for two Issuer Defendants that are incorporated in California, one that is incorporated in Washington and one in Bermuda.

ORDER                                              14

informed the board that "American Express Company (directly or through it subsidiaries)

sold substantial amounts of [the issuing company's] stock from February 25, 2000

through August 24, 2000, thereby violating Section 16(b)'s prohibition against

short-swing trading by company insiders" and "demand[ed] that the Board of Directors

prosecute claims against American Express Company for violations of Section 16(b)." *Id.*

Even though American Express Company had many subsidiaries, the court determined

that the shareholder sufficiently identified the wrongdoer, wrongful acts, and company

harm in its demand letters. *Id.*  Moreover, the court found that the shareholder adequately

requested remedial relief by demanding that the board compel the alleged insider to

disgorge its profits under Section 16(b).  *Id.*

Similar to the demand letters in *Dreiling*, the demand letters in this case

sufficiently identify the alleged wrongdoers by demanding that the issuing company bring

suit against its lead IPO underwriters.  Unlike the demand letters in *Dreiling*, however,

the demand letters here fail to sufficiently identify the factual basis of the wrongful acts,

the harm caused to the corporation, and the requested remedial relief.  The demand letters

sent to the moving Issuer Defendants are nearly identical.  The letters describe the alleged

wrongful act, damage, and remedial remedy in a single paragraph:

> Notwithstanding the short-swing trading prohibition of Section 16, the
> group, through its members engaged in purchase and sales of company
> shares within periods of less than six months during [the one-year relevant
> period].  Additionally, despite the reporting requirements of Section 16(a),
> neither the group nor its members filed Section 16(a) reports for these
> purchase and sale transactions.  The group members should therefore be
> compelled to disgorge the profits they made through the purchase and
> sales of Company Stock during [the one-year relevant period].

(Issuer's Joint Motion to Dismiss (Dkt. # 56), Ex. D).  A few demand letters do identify

certain of the Underwriter Defendants involved in the transactions, but describe with

ORDER                                     15

similar brevity the alleged wrongful act, damage, and remedial remedy in a single paragraph.

Ms. Simmonds' demand letters do not describe the same alleged wrongdoing that she later describes in her complaints.  Unlike American Express in *Dreiling*, the Underwriter Defendants are not alleged to have committed a wrong by merely selling shares they directly owned in less than a six-month period.  Instead, in her complaints, Ms. Simmonds contends that the alleged short-swing transactions were not executed by the Underwriter Defendants but by customers to whom the underwriters had allocated IPO shares.  She also infers that the alleged damage to the issuing companies was the difference between the amount the shares sold for in the IPO and the amount the shares sold for in the immediate aftermarket.  Moreover, according to the complaints, the remedial remedy would be disgorgement of the amount the Underwriter Defendants earned from the customer transactions, and not the customers' profits in their entirety.  The demand letters mention none of this and therefore did not put the Issuer Defendants on notice that Ms. Simmonds was demanding that the corporation compel the Underwriter Defendants to disgorge profits they earned when customers to whom they allocated IPO shares sold such shares in the aftermarket.[13]

Ms. Simmonds' demand letters are also insufficient because the factual basis of the alleged wrongful acts is premised upon mere suspicion and lacks the requisite specificity to give the directors a fair opportunity to initiate suit.  In *Levner*, the court found that the plaintiff's demand letter was inadequate because it "simply was not adequately particular to alert the [issuing company's] board as to the corporate injury, or the relief sought."

---

[13]  Ms. Simmonds not only fails to identify the remedial nature of her demand but also fails to identify any transaction wherein an Underwriter Defendant shared in the profit of any of its investing customers who sold shares in the aftermarket.  The theory is not only novel but based almost entirely on conjecture.

903 F. Supp. at 456.  The demand letter in *Levner* set forth the factual basis for the

alleged wrongdoing by stating that "[i]n light of [this transfer], plaintiff also requested

that [the issuing company] take action with respect to the possibility that [the defendant]

was acting on behalf of others in connection with his purported purchase of [the shares]."

*Id.* at 455-56.  Similarly, Ms. Simmonds bases her complaint on the mere suspicion that

the Underwriter Defendants shared in the profit from the shares their customers sold in

the immediate aftermarket.  Ms. Simmonds' demand letters, however, do not even share

this suspicion with the issuing companies.  Instead, she states only generally that the

Underwriter Defendants made profits from purchases and sales, without providing the

particularity that the board would need in order to make an informed decision about

whether to bring a lawsuit.  "The purpose behind the demand requirement is to give the

directors of a corporation the initial opportunity to redress the wrong."  *Id.* at 456.  Ms.

Simmonds' demand letters are completely lacking in the specificity that would give the

directors a "fair opportunity to initiate the action, [that she] subsequently undertook,"

which is the primary purpose of the demand requirement.  *Shlensky v. Dorsey*, 574 F.2d

131, 141 (3d Cir. 1978).

        At oral argument on this motion, Ms. Simmonds' counsel suggested that Ms.

Simmonds need not provide all the *Levner* information in the demand letter because the

information relating to the concerted activity was contained in the SEC complaints and

the Issuer Defendants should just "go look in [their] own files" for an explanation of the

"Simmonds' theory."  (Tr. (Dkt. # 77) at 27 (explaining that the "thing the SEC is

unhappy with you about is the set of transactions that forms the basis of our claim.").)

Even assuming that telling the corporations to "go look in their own files" to understand

the shareholder's theory for a derivative lawsuit is sufficient, Ms. Simmonds nevertheless

made no effort to explain to the Issuer Defendants how the conduct that formed the basis of the *In re IPO* litigation also supports a claim for Section 16(b) liability.

When questioned at oral argument regarding the form of relief Ms. Simmonds seeks and whether this relief is explained in the demand letters, Ms. Simmonds' counsel stated that the theory of relief may or may not be described in the demand letters but that, even if it was not, Ms. Simmonds was merely claiming disgorgement of profits.  (Tr. at 28.)  Ms. Simmonds' counsel then argued that she is simply claiming disgorgement from "short-swing profits from pair trades involving specific purchase and sales [the Underwriter Defendants] know [of] and we don't."  (*Id.*)  Even this explanation, however, does not adequately explain Ms. Simmonds' theory of relief.  As the court interprets her theory, Ms. Simmonds is not claiming the traditional disgorgement of profits from customers who engaged in short-swing trades, but rather disgorgement of profits from underwriters whose clients - who are not insiders - engaged in short-swing trades.  Thus, Ms. Simmonds is not seeking disgorgement of the customers' profits from the customer; rather, she seeks disgorgement of profits the underwriters allegedly received from the short-swing trades of their customers.  Without analyzing whether this theory is legally cognizable, the court is satisfied that nothing in the demand letters sent to the Issuer Defendants, nor in any of the follow-up letters, explains Ms. Simmonds' multi-layered theory of recovery of profits from short-swing trades.

In her response to the motion to dismiss, Ms. Simmonds points to the additional information that she provided to the issuing companies in follow-up letters.  (Resp. (Dkt. # 59) at 8).  This additional information, however, only pertains to the "group activity related to 'laddering' and 'spinning' connected to the IPO."  (*Id.*)  Ms. Simmonds did not provide any further indication to the boards of any of the Issuer Defendants that the purchases and sales that harmed the issuing company were actually made by the

Underwriter Defendants' customers.  Even considering the additional information provided by Ms. Simmonds, the court finds that Ms. Simmonds failed to give the boards of these companies a sufficient factual basis of the wrongful conduct alleged (i.e., the nature of the purchase and sales), the harm done to the company, or the remedial remedy she seeks.  If Ms. Simmonds was simply claiming that the Underwriter Defendants directly owned shares and sold them in violation of Section 16(b), the demand letters would probably suffice.  As Ms. Simmonds' complaints illustrate, however, her claims are much more complex and novel, requiring a higher level of specificity to put the boards on notice.  Although Ms. Simmonds is correct in arguing that she is not required to identify each specific transaction, she is required to disclose, at minimum, the factual basis for her claims.

Finally, Ms. Simmonds argues that she was not required to make demands upon the issuing companies' boards because such demands would be futile.  Under Delaware law, once a shareholder plaintiff makes a demand upon the directors before filing suit, he or she loses the ability to claim demand futility.  *Levner*, 903 F.Supp. at 456.  Because Ms. Simmonds' demands are insufficient under Delaware law and Rule 23.1, the court dismisses her complaints without prejudice.  The court will not permit Ms. Simmonds to amend her demand letters while pursuing this action.  *See Shlensky*, 574 F.2d at 142 (citing *In re Kauffman Mutual Fund Actions*, 479 F.2d 257, 263 (1st Cir. 1973) ("[T]o hold that demands to satisfy Rule 23.1 may be made on the directors *after* a derivative suit has been initiated would be to reduce the demand requirement of the rule to a meaningless formality.")).  The purpose of the demand is to afford the corporation the opportunity to address the alleged wrong without litigation, to decide whether to invest corporate resources, and to control any litigation that does occur.  It appears to the court when it considers the carbon-copy form of Ms. Simmonds' 54 demand letters, as well as her

vague description of the nature of the alleged wrong, that Ms. Simmonds approached the pre-suit demand requirement as a perfunctory task before instituting these actions and pursuing her novel theory of liability. Accordingly, the court must dismiss the complaints against the 30 moving Issuer Defendants without prejudice.[14]

## C.   Underwriter Defendants' Motion to Dismiss

The Underwriter Defendants move to dismiss Ms. Simmonds' claims pursuant to Federal Rule of Civil Procedure 12(b)(6). When considering a motion to dismiss under Rule12(b)(6), the court construes the complaint in the light most favorable to the non-moving party. *Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 946 (9th Cir. 2005). The court must accept all well-pleaded facts as true and draw all reasonable inferences in favor of the plaintiff. *Wyler Summit P'ship v. Turner Broad. Sys.*, 135 F.3d 658, 661 (9th Cir. 1998). The court's review of the record on a Rule 12(b)(6) motion is generally limited to the complaint itself. *Marder v. Lopez,* 450 F.3d 445, 448 (9th Cir. 2006). The court may, however, rely on facts subject to judicial notice. *States v. Ritchies,* 342 F.3d 903, 908 (9th Cir. 2003). For instance, the court may consider a plaintiff's clarifications in their briefing and at oral argument. *Pegram v. Herdich,* 530 U.S. 211, 230 n.10 (2000) (citing, *Alicke v. MCI Commc'ns Corp.*, 111 F.3d 909, 911 (D.C. Cir. 1997) (citations omitted), in which the court relied on statements in oral argument to clarify complaint).

---

[14]  The remaining 24 Issuer Defendants have not moved to dismiss Ms. Simmonds' complaints for failure to satisfy the pre-suit demand requirement. The court is unable to dismiss the remaining complaints on this basis alone. Although the court may assume that Ms. Simmonds provided the same description of her theory regarding the alleged short-swing transactions to the remaining 24 Issuer Defendants, without something in the record setting forth the extent of information provided to these Issuer Defendants, the court cannot evaluate whether to dismiss the complaints against them for this reason.

A court can dismiss an action under Rule 12(b)(6) where the plaintiff fails to allege either a cognizable legal theory or sufficient facts in support of a cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  While a complaint need not contain detailed factual allegations, a plaintiff's obligation to provide the grounds entitling him to relief requires more than mere labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do.  *Bell Atl. Corp. v. Twombly*, __ U.S. __, 127 S. Ct. 1955, 1964-65 (2007) (citations omitted).  The complaint must plead "enough facts to state a claim to relief that is plausible on its face."  *Id.* Specific facts are not necessary.  *Johnson v. Riverside Healthcare Sys.*, 534 F.3d 1116, 1121-22 (9th Cir. 2008) (citations omitted).  The complaint need only advise the defendant of what the claim is and the grounds upon which it rests.  *Id.* (applying *Twombly* to a complaint alleging a civil rights violation pursuant to 42 U.S.C. § 1981).

As discussed above, the Underwriter Defendants seek to dismiss the remaining 54 complaints on the following bases: (1) the Underwriter Defendants do not meet the two-prong test for pleading "beneficial ownership"; (2) the allegations that the Underwriter Defendants had a pecuniary interest in the issuer stock are insufficient to support a group theory; (3) Ms. Simmons fails to plead a specific purchase or sale within a six-month period; (4) Ms. Simmonds' claims are time-barred by the two-year statute of limitation for Section 16(b) claims; (5) the Underwriter Defendants are shielded from Section 16(b) liability by the Underwriter's Exemption; (6) the Underwriter Defendants are shielded from Section 16(b) liability by the Market-Making Exemption; and (7) Ms. Simmonds fails to plead lack of good faith with particularity.  The court considers the fourth basis – the two-year statute of limitations – dispositive and therefore considers it first.

ORDER                                        21

**1.      Application of Equitable Tolling**

Because only 30 of the 54 Issuer Defendants moved to dismiss Ms. Simmonds'
claims based on failure to provide an adequate demand and only the Issuer Defendants
have standing to bring such a challenge, the court moves on to address the Underwriter
Defendants' motion to dismiss in the remaining 24 cases.

Even though claims under Section 16(b) must be brought within two years after the
alleged transaction occurs, the statutory period may be tolled if the beneficial owner fails
to report the transaction as required under Section 16(a). *Whittaker*, 639 F.2d 516 at 528.
The Underwriter Defendants, as well as the Issuer Defendants, argue that the statute of
limitations bars any Section 16(b) claim because the Underwriter Defendants were not
subject to Section 16(a) reporting requirements.  As discussed further below, the court
finds that the Issuer Defendants' shareholders were fully advised of the facts giving rise to
Ms. Simmonds' claim well over five years before Ms. Simmonds filed these actions.  As
such, the court is not persuaded that equity is furthered by tolling the limitations period in
these cases.

The Underwriter Defendants contend that the statute of limitations expired because
shareholders had the necessary information to assert a Section 16(b) claim more than two
years ago.  Under the "disclosure" interpretation adopted by the Ninth Circuit, an
insider's failure to disclose covered transactions in the required Section 16(a) reports tolls
the two-year limitations period connected with such a non-disclosed transaction.
*Whittaker,* 639 F.2d at 527.  In *Whittaker*, the Ninth Circuit held that the period beings to
run when the transactions are disclosed in the insider's Section 16(a) report.  *Id.*  The
Ninth Circuit rejected the more lenient "notification" approach which triggers the running
of the two-year period once the corporation (and thus indirectly the shareholders) has
sufficient information to put it on notice of its Section 16(b) claims.  *Id.* at 529.  Instead, it

adopted the disclosure interpretation, in part, to ensure notification to shareholders, but also to recognize Congress' goal "to impose absolute accountability within clearly demarcated boundaries" under Section 16.  *Id.*

> This goal of clear boundaries is served by a limitations period which can be mechanically calculated from objective facts.  The dates on which purchases and sales are made are such facts, as are the dates on which Section 16(a) reports are filed with the SEC.  By contrast, under the notice interpretation, the running of the limitations period would depend on uncertain determinations of what knowledge should lead a corporation to discover its cause of action.  Thus, the disclosure interpretation better serves the statute's purpose than the notice interpretation.

*Id.*

More recently, the Second Circuit allowed the statutory limitations period to run until the company (and shareholders) received actual notice "tantamount to a Form 4" regarding a transaction.  *Litzler v. CC Invs. L.D.C.,* 362 F.3d 203, 208 (2d Cir. 2004).  In adopting an actual notice standard, the Second Circuit recognized that requiring actual notice created uncertainty with respect to otherwise long-settled transactions.  *Id.* at 208 n.5.  It nevertheless concluded that actual notice better served the goals of Section 16 because it neither required identifying "circumstances in which a person would or should have realized the non-compliance" nor relied on "the ability of a shareholder or company to piece together the substance of a Form 4 from disparate sources of information."  *Id.* at 208.  The Second Circuit did not divorce equitable tolling from justifiable circumstances completely, however.  *Id.* (stating that "[a]ssuming the circumstances are found to justify equitable tolling in this case" then tolling would end on the date by which the plaintiff received actual notice of the claim).  Judge Jacobs, writing for the Second Circuit in *Litzler*, cautioned in a footnote that allowing the statute of limitations to be tolled solely because a defendant failed to file Section 16(a) reports would result in indefinite liability,

thereby "affect[ing] long-settled transactions [that] might hang forever over honest persons." *Id.* at 208 n.5.

Here, unlike *Whittaker* and other cases employing the equitable tolling doctrine in Section 16(b) cases, there is no dispute that all of the facts giving rise to Ms. Simmonds' complaints against the Underwriter Defendants were known to the shareholders of the Issuer Defendants for at least five years before these cases were filed.  The only recent development giving rise to these claims is Ms. Simmonds' acquisition of shares in the 54 Issuer Defendants' companies.  Of note, there is no dispute that the shares were acquired at the direction of Ms. Simmonds' father who is a securities lawyer with experience in Section 16(b) litigation.  While the court need not consider the steps taken in attempting to establish standing in these cases to determine whether equitable tolling is appropriate, the court does rely on the fact that the only significant development occurring within the last two years was Ms. Simmonds' acquisition of the shares in these companies.  All other facts relied upon in these cases were known to the shareholders over five years before these complaints were filed.  This leads the court to seriously question the application of principles of equity to the cases before it.

The definition of equity, i.e., the "recourse to principles of justice to correct or supplement the law as applied to particular circumstances" or the "body of principles constituting what is fair and right," persuades the court that equitable tolling does not apply to the situation before it.  BLACK'S LAW DICTIONARY 579 (8th ed. 2004); *see also U.S. ex rel. Hyatt v. Northrup Corp.*, 91 F.3d 1211, 1216 (9th Cir. 1996) (explaining that equitable tolling is read into every federal statute and that the rationale behind tolling requires that the statute of limitations start to run when the plaintiff acquires knowledge of the wrongful activity).  The court indicated its hesitation to apply these principles to Ms. Simmonds' complaints at oral argument.  Ms. Simmonds' counsel responded that the

court could simply give the doctrine another name.  (Tr. at 34.)  Changing the nomenclature, however, does not change the court's conclusion that tolling is not appropriate in this case.

While the *Whittaker* court adopted a bright-line test for determining whether a "disclosure" by an insider of the corporation has been made in order to determine the tolling of the statute, the *Whittaker* decision does not resolve whether the statute should be tolled in this case.  In *Whittaker*, the court was faced with a much different factual situation.  The defendant in *Whittaker*, William Whittaker, was a corporate insider of Whittaker Corporation as was his mother, Beuleh Whittaker.  *Whittaker*, 639 F.3d at 518. Mr. Whittaker failed to disclose to the corporation that he had total control over the shares owned by his mother and was thus a beneficial owner of her shares.  *Id.* at 523.  When the corporation learned the full extent of Mr. Whittaker's control over his mother's shares it compiled a list of short-swing trades using both accounts.  *Id.* at 519.  It then demanded payment from Mr. Whittaker of the profits he realized from the short-swing trades.  *Id.* Mr. Whittaker paid the demand and then sued for a declaration of nonliability under Section 16 and to recover the money he paid.  *Id.*

The district court in *Whittaker* held that Mr. Whittaker was liable for short-swing trades but only those made during the statutory two-year period, which cut out a substantial portion of the corporation's recovery – almost four years of trades were eliminated.  *Id.*  The Ninth Circuit, under those facts, held that the two-year period was tolled, essentially indefinitely, until Mr. Whittaker filed his Form 4.  *Id.* at 530.  The Ninth Circuit reasoned that it was providing "absolute accountability within clearly demarcated boundaries."  *Id.*  This reasoning does not apply in this case.  Here, there are no "demarcated boundaries" because the novelty of Ms. Simmonds' theory neither gives the insiders sufficient notice of the possibility of having to file a Form 4 (i.e., the

underwriters should have known that allocating IPO shares to their best customers in return for more business could lead to Section 16(b) liability) nor does it provide any end date of liability for the issuing companies or the underwriters.[15]  Indeed, Ms. Simmonds' counsel acknowledged that under her theory she could buy stocks in companies who had IPOs 20 years ago and bring claims for short-swing transactions if the underwriters had undervalued a stock.  The court is not persuaded that permitting shareholders to go back 20 years with novel claims for Section 16(b) liability would further the congressional intent of the statute.  Accordingly, the court does not apply equitable tolling to Ms. Simmonds' claims.

## IV.  CONCLUSION

For the reasons stated, the court GRANTS in part and DENIES in part the motions before it.  The court GRANTS the motion to dismiss filed by 30 of the Issuer Defendants in C07-1549 (Dkt. # 56) without prejudice.  The court GRANTS the omnibus motion to dismiss filed by the Underwriter Defendants in C07-1549 (Dkt. # 57) as to the remaining 24 cases.  The court dismisses these complaints with prejudice.  The remaining motions are DENIED as MOOT: the supplemental individual motion to dismiss filed by Issuer Defendant Intersil Corporation in C07-1572 (Dkt. # 47); the supplemental individual motion to dismiss filed by Issuer Defendant Audible Inc. in C07-1623 (Dkt. # 33); and the supplemental individual motion to dismiss filed by Issuer Defendant Packeteer Inc. in C07-1654 (Dkt. # 39).

---

[15]  The court questioned whether Ms. Simmonds was claiming that she was not "on notice" of the claim because the Underwriter Defendants had not filed their Form 4.  Ms. Simmonds' counsel candidly responded that he did not know the answer to that question.  He then went on to explain that if she is considered to be on notice, he would go out and find a plaintiff that was not on notice.  (Tr. at 32.)  This exchange accurately reveals the incongruent result when the bright-line rule set forth in *Whittaker* is applied to the facts in this case.  Until such time as the Underwriter Defendants file a Form 4 – essentially admitting liability – the statute is tolled forever.

ORDER                                                    26

1

2   Dated this 12th day of March, 2009.

3

4            _____

5            JAMES L. ROBART

6            United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORDER          27